UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

| | |
|---|---|
| **KEITH A. MOREL,** | ) |
| | ) |
|     **Plaintiff,** | ) |
| | ) |
| | )   **Case No.: 2:10-cv-02453-MHH** |
| **v.** | ) |
| | ) |
| **CHEVRON MINING, INC.,** | ) |
| | ) |
|     **Defendant.** | ) |
| | ) |

## MEMORANDUM OPINION

In this action against his former employer, Chevron Mining, Inc. ("CMI"), plaintiff Keith A. Morel alleges that CMI interfered with his rights under the Family and Medical Leave Act and retaliated against him for exercising those rights. Mr. Morel also asserts a claim for age discrimination under the Age Discrimination in Employment Act, and he asserts state law claims for assault and battery, negligent hiring, and breach of contract.[1] CMI asks the Court to enter judgment in its favor on all of these claims because the claims fail as a matter of law. For the reasons discussed below, the Court grants summary judgment in favor

---

[1] Initially, Mr. Morel also stated claims against CMI for disability discrimination and retaliation under the Americans with Disabilities Act (ADA), and claims for retaliation under both the Occupational Safety and Health Act of 1970 (OSHA) and the Mine Safety and Health Act of 1971 (MSHA). (Doc. 1). However, in Mr. Morel's response in opposition to CMI's motion for summary judgment, he conceded that he could not state a claim under either the ADA, OSHA, or MHSA. (Doc. 24, pp. 26, 32). The Court grants CMI's motion for summary judgment on these claims.

of CMI on Mr. Morel's age discrimination, assault and battery, negligent hiring, and breach of contract claims. The Court will issue an order requesting additional briefing on Mr. Morel's FMLA claims.

## I.   STANDARD OF REVIEW

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). To demonstrate that there is a genuine dispute as to a material fact that precludes summary judgment, a party opposing a motion for summary judgment must cite "to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials." Fed. R. Civ. P. 56(c)(1)(A). When considering a summary judgment motion, the Court must view the evidence in the record in the light most favorable to the non-moving party. *Hill v. Wal-Mart Stores, Inc.*, 510 Fed. Appx. 810, 813 (11th Cir. 2013). "The court need consider only the cited materials, but it may consider other materials in the record." Fed. R. Civ. P. 56(c)(3).

## II.   FACTUAL AND PROCEDURAL BACKGROUND

Mr. Morel began working for Chevron in April 1984. (Doc. 21-1, p. 18). In January 2006, defendant Chevron Mining, Inc. (CMI) hired Mr. Morel as a safety

specialist at its North River Mine ("NRM"). (Doc. 21-1, pp. 33–34, 38–40). As a safety specialist, Mr. Morel performed safety-related tasks both above and below ground at the mine, conducted training sessions, and accompanied federal and state inspectors on tours of the mine. (Doc. 21-1, pp. 39–41). When Mr. Morel began working at NRM in 2006, he reported to safety supervisor Joe Brasfield. (Doc. 21-1, p. 36). Mr. Morel also worked with Eli Creel, a safety and security specialist who was promoted to safety coordinator in 2007. (Doc. 21-5, p. 21). Barry Kimbrell was the safety manager at NRM in 2008 and 2009. (Doc. 21-9, ¶ 3).

**Improper Reporting of Dust Samples**

At some point during Mr. Morel's employment as a safety specialist, Mr. Creel oversaw dust sampling at NRM. (Doc. 21-5, p. 30). Dust sampling is the process of monitoring dust pumps that measure the respirable dust concentration underground. (Doc. 21-5, pp. 18–19). After the dust pump is turned off, an employee removes a cassette from the pump, writes down how long the pump was run on a dust sampling card, and mails the card and cassette to MSHA. (Doc. 21-5, pp. 32–33; Doc. 21-3, pp. 89–92). Mr. Creel instructed Mr. Morel to write "480 minutes" on each dust sampling card regardless of what the pump timer actually said. (Doc. 21-2, p. 92). Mr. Morel disagreed with this practice and reported Mr. Creel to the safety hotline. (Doc. 21-3, pp. 1–2). As a result of Mr. Morel's complaint, MSHA conducted an investigation and instructed Mr. Creel and CMI

that it was necessary to write down the actual amount of time the pump ran. (Doc. 21-3, p. 4).

**Mr. Morel's Performance Evaluations**

During his time as a safety specialist for CMI, Mr. Morel received annual employee evaluations. CMI called the evaluations PMPs. (Doc. 21-1, p. 58). CMI delivered Mr. Morel's 2007 PMP to him in April 2008. (Doc. 21-6, p. 24). On the 2007 PMP, Mr. Morel received a "3" or "falls short of performance expectations," the lowest performance rating that an employee may receive. (Doc. 21-6, p. 24). The 2007 PMP performance feedback section cited Mr. Morel's failure to create a colored ribbon sheet, coordinate first aid training, organize a bulletin board, and complete inspections and repairs of fire valves. (Doc. 21-6, p. 24).

Mr. Morel attached written comments to the PMP that disputed the criticisms of his work performance. (Doc. 21-6, pp. 25–26). With respect to the colored ribbon sheet project, Mr. Morel explained that the project was critiqued before it was completed, but after he re-worked the format, his supervisors deemed the finished product excellent. (Doc. 21-6, p. 25). Regarding the first aid training, Mr. Morel explained that medical problems prevented him from completing all of the scheduled classes and that of the classes he was able to teach, management did not support him in obtaining student attendance. (Doc. 21-6, p. 25). With respect

4

to the bulletin board, Mr. Morel contended that he did complete the task, but his safety manager informed him that the arrangement was not acceptable. (Doc. 21-6, p. 25). Mr. Morel also maintained that he always posted MSHA citations and added new plans and required documents as requested. (Doc. 21-6, p. 25). Regarding inspections and repairs of fire valves, Mr. Morel argued that the task was given to him in April 2008 and should not have been listed on his 2007 performance evaluation. (Doc. 21-6, p. 25).

Mr. Morel's 2008 PMP was dated January 26, 2009, the date of his termination. (Doc. 21-6, p. 28). Mr. Morel testified that PMPs ordinarily are given in March, April, or May. (Doc. 21-2, p. 5). On his 2008 PMP, Mr. Morel again received a rating of "falls short of performance expectations." (Doc. 21-6, p. 28). The performance feedback cited Mr. Morel's failure to complete 86 "BBS Observations" and 96 underground inspections, as well as his lack of preparation for teaching training classes. (Doc. 21-6, p. 28). The feedback section of the review also noted six discussions that CMI management had with Mr. Morel about his poor job performance, although the first two discussions listed occurred on or before the administration of Mr. Morel's 2007 PMP. (Doc. 21-6, p. 28).

**Altercation with Mr. Steele**

On August 29, 2008, Mr. Morel attended a meeting with Mr. Creel and Tommy Joe Steele, an independent contractor who CMI hired to help manage the

CMI safety department. (Doc. 21-3, pp. 22–23; Doc. 21-5, pp. 44–50). At that meeting, Mr. Steele grabbed Mr. Morel by the shoulders and shook him. (Doc. 21-3, pp. 22–24). Mr. Morel had bruising on his shoulders from where Mr. Steele grabbed him. (Doc. 21-3, p. 28). Later that day, Mr. Morel reported the incident to CMI's hotline. (Doc. 21-3, pp. 30–31). CMI conducted an investigation and concluded that Mr. Morel's allegations were not substantiated. (Doc. 21-10, pp. 2–4).

**Mr. Morel's Surgeries and Medical Leave**

During Mr. Morel's employment at NRM, Mr. Morel required several surgeries. (Doc. 21-2, pp. 61–65). First, Mr. Morel was out for knee surgery for a little more than a week. (Doc. 21-2, pp. 56–57). Next, Mr. Morel had carpel tunnel surgery. (Doc. 21-2, p. 60). Mr. Morel also had back surgery. (Doc. 21-2, pp. 61–62). Finally, Mr. Morel underwent an ulnar bone reduction after the original repositioning for his carpal tunnel was unsuccessful. (Doc. 21-2, pp. 64–65). Mr. Morel notified Mr. Steele and Mr. Brasfield that he would be taking leave for his ulnar bone reduction surgery. (Doc. 21-3, p. 64).

Mr. Morel never requested FMLA leave for his surgeries; instead, he requested and received paid medical leave. (Doc. 21-2, pp. 74–75). CMI never notified Mr. Morel that he was eligible for FMLA leave for any of his surgeries.

(Doc. 21-3, p. 65).  In fact, CMI admits that FMLA leave "never was offered or discussed" with Mr. Morel.  (Doc. 28, p. 4).

The record is unclear regarding the length of Mr. Morel's medical leave following his bone reduction surgery.  Mr. Morel testifies that he was out of work for "a month or so."  (Doc. 21-2, p. 79).  The complaint states that Mr. Morel "underwent a surgical procedure on October 15, 2008, and requested sick leave for the procedure and his ensuing recovery" and that Mr. Morel "returned to work on January 15, 2009."  (Doc. 1, ¶¶ 24, 28).  One of Mr. Morel's medical records, dated November 25, 2008, states that Mr. Morel was unable to work beginning on October 17, 2008.  (Doc. 21-11, p. 9).  Another record from the same doctor shows that Mr. Morel was cleared to return to limited duty beginning November 15, 2009.  (Doc. 21-11, p. 3).

Mr. Morel's co-workers, including safety manager and decision maker Barry Kimbrell, expressed frustration regarding the amount of time that Mr. Morel had to miss work.  (Doc. 21-7, pp. 25–27).  On at least five occasions, Mr. Creel said to Mr. Morel, "[y]ou're always out."  (Doc. 21-2, pp. 83–84).

**The Expense Report**

Mr. Morel was dissatisfied with his situation at NRM, so he began investigating other jobs within the Chevron companies.  (Doc. 21-1, p. 42).  In November 2008, Mr. Morel traveled to Seattle, Washington at a related Chevron

7

company's expense to interview for a job. (Doc. 21-2, pp. 17–18). On this trip, Mr. Morel had a $50-per-meal budget. (Doc. 21-2, p. 21). While in Seattle, Mr. Morel charged two meals to his Chevron credit card that exceeded the $50-per-meal budget: a $78.04 lunch at the Space Needle and a $179.17 dinner at Oceanaire restaurant. (Doc. 21-2, p. 18). Mr. Morel submitted these charges to Chevron's Travel Expense Accounting (TEA) system. (Doc. 21-2, pp. 16, 21).

Ruben Macias, a representative of the related Chevron company, refused to approve the charges and informed Mr. Morel that he could not approve charges for more than $50 per meal. (Doc. 21-2, p. 21; Doc. 21-6, p. 34). Mr. Morel then filled out an expense report in TEA that listed the $78.04 and $179.17 charges as though they were several $50 meals spread over three days. (Doc. 21-2, p. 22; Doc. 21-6, pp. 29, 33). Mr. Morel testifies that he never submitted that report to TEA; instead, he maintains that he took a screen shot of the report and e-mailed the screen shot to Mr. Macias. (Doc. 21-2, pp. 23–25; Doc. 21-6, p. 29). Upon receiving the purported expense report, Mr. Macias responded, "I reviewed the updated report in TEA and all you did was spread the charges out over three day [sic]." (Doc. 21-6, p. 33). Mr. Macias directed Mr. Morel to resubmit the original charges and adjust for the $50.00 limit. (Doc. 21-6, p. 33). Mr. Morel responded that he would "discuss with Brasfield tomorrow before proceeding and let you know how it will be addressed." (Doc. 21-6, p. 33). Mr. Macias replied that

8

"readjusting your TEA to make it fit the trip doesn't sound right" and stated that he thought it was "against Chevron Way behaviors." (Doc. 21-6, p. 31). Mr. Morel replied that he agreed and would submit a new report per Mr. Macias's instructions. (Doc. 21-6, p. 31). Mr. Morel subsequently submitted an expense report that listed a $50 charge for each of the two meals and sent a check to the credit card company for the difference. (Doc. 21-2, pp. 22–23, 25; Doc. 21-6, p. 31).

Mr. Macias reported the incident with the expense report to CMI. (Doc. 21-8, pp. 50–51). Robert Ray, NRM's human resources labor relations supervisor, investigated the matter. (Doc. 21-8, pp. 12, 52). Mr. Ray concluded that Mr. Morel submitted a falsified expense report. (Doc. 21-8, pp. 53–55). Mr. Ray reported his findings to Mr. Kimbrell. (Doc. 21-8, p. 56; Doc. 21-9, ¶¶ 6–8). Mr. Kimbrell testifies that based upon the circumstances surrounding Mr. Morel's expense report and Mr. Morel's poor performance reviews, Mr. Kimbrell decided to terminate Mr. Morel's employment. (Doc. 21-9, ¶¶ 7–8). Mr. Kimbrell discussed this decision with Stan Crank, the Mine Manager, and Mr. Crank concurred in the decision. (Doc. 21-9, ¶ 8).

**Mr. Morel's Termination**

Mr. Morel returned to NRM from his medical leave for bone reduction surgery on January 15, 2009. (Doc. 1, ¶ 28; Doc. 21-3, p. 66). On January 16,

9

2009, CMI suspended Mr. Morel. (Doc. 21-4, p. 5). CMI's record of discussion regarding Mr. Morel's suspension does not mention Mr. Morel's expense report; it cites Mr. Morel's allegedly unacceptable conduct and behavior that took place in April, May, and August of 2008. (Doc. 21-4, p. 5). The record also states that "[a]ny further unsatisfactory conduct and behaviour will result in disciplinary action up to and including discharge." (Doc. 21-4, p. 5).

When Mr. Morel returned from his suspension on January 26, 2009, Mr. Kimbrell fired him. (Doc. 21-2, p. 9; Doc. 21-4, p. 6). Mr. Ray and Mr. Brasfield were present at the time. (Doc. 21-2, p. 9). The record of discussion for the termination meeting cites Mr. Morel's poor 2007 performance review. (Doc. 21-4, p. 6). The record also states that "[d]uring the 2008 performance year, your performance has not improved, subsequently resulting in another 3 rating on your PMP." (Doc. 21-4, p. 6). Mr. Morel's 2008 PMP is dated January 26, 2009, the same date of his termination. (Doc. 21-4, p. 4). The summary of the termination discussion states that Mr. Morel submitted a falsified expense report. (Doc. 21-4, p. 6). When Mr. Morel was notified that he would be terminated, he opted to retire. (Doc. 21-2, pp. 37–38; Doc. 21-9, ¶ 8).

Shortly after CMI fired Mr. Morel, CMI underwent a reduction in force. (Doc. 21-5, pp. 59–60; Doc. 21-7, p. 17). When CMI terminated Mr. Morel, there were four other safety specialists working at the NRM: Jim Saunders, who was in

his mid-to-late fifties; Belinda Barnett, who was in her early fifties; Mark Miles, who was in his early forties; and Shane Donald, who was in his early thirties. (Doc. 21-5, pp. 57–58). CMI originally planned to release three of the five safety specialists, (Doc. 21-5, p. 59); however, because Mr. Morel was terminated and Mr. Donald found another job, CMI let go only one employee during the reduction in force: Ms. Barnett. (Doc. 21-5, p. 59).

**The Current Proceeding**

On September 10, 2010, Mr. Morel filed a complaint against CMI, asserting claims for violation of the Family and Medical Leave Act ("FMLA") of 1993 (Counts I and II), violation of the Americans with Disabilities Act ("ADA") (Counts III and IV), violation of the Age Discrimination in Employment Act ("ADEA") (Count V), assault and battery (Count VI), negligent hiring, training, supervision and retention (Count VII), violation of the Occupational Safety and Health Act ("OSHA") (Count VIII), violation of the Mine Safety and Health Act ("MSHA") (Count IX), and breach of contract (Count X).[2] (Doc. 1). CMI filed a motion for summary judgment, asking the Court to dismiss Mr. Morel's claims pursuant to Rule 56 of the Federal Rules of Civil Procedure. (Doc. 20). The

---

[2] Three additional allegations in the complaint have been omitted in this opinion because Mr. Morel asserted them against The Reed Group, LTD., a party that was dismissed as a defendant on May 23, 2011. (Doc. 14).

parties fully briefed the motion. (Docs. 24, 28). On this record, the Court considers CMI's motion for summary judgment.

## III. ANALYSIS

### A. Mr. Morel's FMLA Claims

Mr. Morel asserts that CMI denied him full benefits and rights under the FMLA and that CMI retaliated against him for exercising his rights under the FMLA. (Doc. 1, pp. 6, 8). After a thorough review of the record and the parties' briefs, the Court finds that the parties have not adequately addressed the FMLA issues in this case. The Court will issue a separate order requesting briefing on Mr. Morel's FMLA claims.

### B. Mr. Morel's Age Discrimination Claim

The Eleventh Circuit applies the *McDonnell Douglas* burden-shifting framework to ADEA claims like this one that are based on circumstantial evidence. *Sims v. MVM, Inc.*, 704 F.3d 1327, 1332 (11th Cir. 2013) (citing *Chapman v. Al Transport*, 229 F.3d 1012, 1024 (11th Cir. 2000) (*en banc*)). In cases such as this where the employer discharged the plaintiff and subsequently made a reduction in force, the plaintiff can establish a *prima facie* case by demonstrating that "(1) he was in a protected age group; (2) he was adversely affected by an employment decision; (3) he was qualified for his current position or to assume another position at the time of discharge; and (4) the evidence could lead a factfinder reasonably to

conclude that the employer intended to discriminate on the basis of age." *Mitchell v. City of LaFayette*, 504 Fed. Appx. 867, 870 (11th Cir. 2013).

Mr. Morel cannot establish a *prima facie* case of age discrimination. The only evidence that Mr. Morel presents relating to age discrimination is his assertion that during CMI's reduction in force, CMI "terminated two of its three oldest safety and security specialists." (Doc. 24, p. 30). This assertion mischaracterizes the facts.

Before Mr. Morel's termination, CMI employed five safety specialists: Mr. Morel (age fifty-five); Jim Saunders (mid-to-late fifties); Belinda Barnett (early fifties); Mark Miles (early forties); and Shane Donald (early thirties). (Doc. 21-5, pp. 57–59; Doc. 21-2, p. 48–49). Safety Coordinator Eli Creel testified that soon after CMI terminated Mr. Morel's employment, CMI underwent a reduction in force. (Doc. 21-5, p. 58). As a result of that reduction in force, CMI originally planned to let go three safety specialists. (Doc. 21-5, p. 59). However, because CMI terminated Mr. Morel's employment for reasons unrelated to the RIF and Mr. Donald found other employment, CMI only had to terminate one employee in the RIF. CMI chose to terminate Ms. Barnett. (Doc. 21-5, p. 59).

Mr. Morel does not present any evidence that Ms. Barnett was let go because of her age. In fact, Mr. Saunders—not Ms. Barnett—was the oldest remaining safety supervisor. Moreover, given that Mr. Donald found other employment, the

three remaining safety specialists who CMI could have let go were all more than forty years old. This evidence falls far short of establishing a prima facie case of age discrimination. *See Mitchell*, 504 Fed. Appx. at 871 ("[T]he fact that younger employees were retained in [plaintiffs]'s departments does not support an inference of discriminatory intent in light of the fact that the [employer] also retained other employees who were well over the age of 40 in those departments . . . ."). Therefore, CMI is entitled to summary judgment on Mr. Morel's age discrimination claim.

**C. Mr. Morel's Claims For Assault and Battery, And Negligent Hiring, Training, Supervision, and Retention**

Mr. Morel maintains that CMI is liable for assault and battery, and negligent hiring, training, supervision, and retention, as a result of the altercation between him and safety manager Tommy Joe Steele. (Doc. 1, pp. 13–15). CMI counters that the exclusivity provision of the Alabama Worker's Compensation Act bars these claims. (Doc. 28, p. 15). The Court agrees.

The exclusivity provision of the Act states:

> The rights and remedies granted in this chapter to an employee shall exclude all other rights and remedies of the employee . . . at common law, by statute, or otherwise on account of injury, loss of services, or death. Except as provided in this chapter, no employer shall be held civilly liable for personal injury to or death of the employer's employee, for purposes of this chapter, whose injury or death is due to an accident or to an occupational disease while engaged in the service or business of the employer, the cause of which accident or occupational disease originates in the employment.

14

Ala. Code 1975 § 25-5-53. "An injury resulting from a willful and criminal assault upon the employee by a fellow employee may be considered an accident under the workers' compensation statutes." *Austin v. Ryan's Family Steakhouses*, 668 So. 2d 806, 807 (Ala. Civ. App. 1995).

In *Austin*, the plaintiff sued his employer for assault and negligent hiring after the plaintiff's supervisor assaulted him on the employer's premises during working hours. *Id.* The Court of Civil Appeals of Alabama affirmed the trial court's entry of summary judgment for the employer, holding that the exclusivity provision of the Worker's Compensation Act barred the plaintiff's claims for assault and negligent hiring. *Id.* at 808. Similarly, in *Cook v. AFC Enterprises, Inc.*, 826 So. 2d 174, 176–78 (Ala. Civ. App. 2002), the plaintiff was involved in a fight with her supervisor in the course of her employment. The plaintiff sued her employer for assault and battery, and negligent hiring and supervision. *Id.* at 175. The appeals court affirmed the trial court's entry of summary judgment in favor of the employer, concluding that the plaintiff's exclusive remedy for her injuries was an action under the Act. *Id.* at 178.

In this case, Mr. Morel alleges that Mr. Steele, his supervisor, physically grabbed and shook him during an August 2008 meeting at their workplace. (Doc. 24, p. 31). Mr. Morel asserts that at the time of the purported assault, Mr. Steele "was acting in furtherance of the business of [CMI]" and "was within the line and

scope of his employment." (Doc. 24, p. 31). Like the plaintiffs in *Austin* and *Cook*, Mr. Morel's only remedy is a worker's compensation action. Therefore, Mr. Morel's assault and battery and negligent hiring claims fail as a matter of law.

**D.    Mr. Morel's Breach of Contract Claim**

Mr. Morel contends that CMI's policy for handling complaints about safety and health violations constituted a contract and that CMI breached that contract when the company terminated him in retaliation for making a safety complaint about dust sampling. (Doc. 1, p. 18; Doc. 24, p. 32). This claim fails for at least two reasons. First, Mr. Morel has not placed evidence of CMI's alleged policy in the record. To prevail on a breach of contract claim, Mr. Morel first must establish that he was a party to a viable contract with CMI. *See City of Gadsden v. Harbin*, 148 So. 3d 690, 696 (Ala. 2013). Mr. Morel has not carried that burden. The Court notes that the record suggests that Mr. Morel was an at-will employee. Under state law, an employer may fire an at-will employee for any reason or for no reason at all. *See Ex parte Isbell*, 153 So. 3d 8, 23 n.13 (Ala. 2013) (citing *Culbreth v. Woodham Plumbing Co.*, 599 So. 2d 1120, 1121 (Ala. 1992)).

In reality, the claim that Mr. Morel attempts to frame as a state law breach of contract claim actually is a federal law claim for retaliation under the Federal Mine Safety and Health Act of 1977. *See* 30 U.S.C. § 815(c)(1) (prohibiting coal mine operators from discharging an employee for complaining about safety or health

violations). Mr. Morel admits that he did not comply with the administrative requirements for pursuing a claim under the Mine Act. (Doc. 24, p. 32). Therefore, Mr. Morel cannot pursue a retaliation claim, and his breach of contract claim fails as a matter of law.

### IV. CONCLUSION

For the reasons stated above, the Court **GRANTS** CMI's motion for summary judgment on all of Mr. Morel's claims except his claims under the FMLA. The Court will issue a separate order requesting briefing on Mr. Morel's FMLA claims. The Court directs the Clerk to please **TERM** Doc. 20.

**DONE** and **ORDERED** this March 31, 2015.

_____
**MADELINE HUGHES HAIKALA**
UNITED STATES DISTRICT JUDGE